911 P.2d 235

State of New Mexico ex rel., Children, Youth and Families Department, In the Matter of Annette F., David F. Jr., Joan F., Jesse F., Joanne F., Laura Lee F., Billy Jack F., and Cheyenne F., Children, and concerning David F., Sr., and Sharon F., Respondents.

STATE of New Mexico, ex rel. CHILDREN, YOUTH AND FAMILIES DEPARTMENT, Petitioner–Appellee,

v.

DAVID F. SR., and Sharon F., Respondents–Appellants.

No. 16080.

Court of Appeals of New Mexico.

Dec. 6, 1995.

Certiorari Denied Jan. 31, 1996.

Roy E. Stephenson, Children's Court Attorney, Children, Youth and Families Department, Santa Fe, for petitioner-appellee.

Tina S. Boradiansky, Santa Fe, for respondents-appellants.

## OPINION

FLORES, Judge.

1. David F., Sr. (Father) and Sharon F. (Mother), Respondents–Appellants (referred to collectively as Parents), appeal from the district court's termination of their parental rights to four of their eight children under the Abuse and Neglect Act, NMSA 1978, §§ 32A–4–1 to –33 (Repl.Pamp.1995). We address the issues raised by Parents as follows: (1) whether the district court was required to conduct an evidentiary hearing concerning Parents' claim of ineffective assistance of counsel; (2) whether this Court must remand to the district court for an evidentiary hearing; (3) whether Parents were denied effective assistance of counsel; and (4) whether the district court erred in finding that the termination of Parents' parental rights was supported by clear and convincing evidence. Issues raised in the docketing statement but not briefed are deemed abandoned. *State v. Fish*, 102 N.M. 775, 777, 701 P.2d 374, 376 (Ct.App.), *cert.*

*denied,* 102 N.M. 734, 700 P.2d 197 (1985). We affirm.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

2. The family first became known to the Children, Youth and Families Department, Petitioner–Appellee (CYFD), in October 1990 when it received a referral from the Social Services Department in New Bedford, Massachusetts alleging sexual abuse of Annette by Father. Although criminal charges for sexual assault and sexual exploitation were filed with the police department, the District Attorney's Office elected not to prosecute Father when the family left Massachusetts and moved to New Mexico. The six children were placed in CYFD legal and physical custody on October 10, 1990. The two youngest children had not yet been born. On October 12, 1990, CYFD filed a petition against Parents alleging sexual abuse, alcohol abuse, and physical neglect due to overcrowded, unsanitary, and inadequate living conditions. On March 15, 1991, the district court entered an order adjudicating the six children to be abused and neglected. Thereafter, the children were returned to Parents' physical custody. The case was ultimately dismissed and legal custody was returned to Parents on January 21, 1993. At this time, CYFD continued to provide services to the family on a voluntary basis.

3. The facts giving rise to the petition in this case arose on April 8, 1993, when CYFD received a referral stating that Mother had been raped and severely beaten by Father. According to Jennifer Wheeler, a social worker assigned to the case, Mother stated that Father had beaten her with a billy club, raped her with the same club, and kicked her at least thirty times. As a result of the beating, Mother was bruised over her entire body with the exception of the soles of her feet and had to undergo surgery to repair several tears in her vaginal wall. After Mother was released from the hospital, she stated that "it was a once in a lifetime thing," but later denied that Father was the perpetrator and claimed that it was some neighborhood women who beat her. Father admitted that he was told by hospital personnel that Mother was treated for bruises in her vagina and was aware that CYFD claimed that Mother was raped with a billy club, but stated that Mother denied being raped and claimed that she was kicked. Santa Fe police detectives who were called to the home found all of the children hiding in one room. The children stated that they heard the fight but stayed in the room because they were afraid. Annette told officers that she wanted to help her mother but was afraid that Father would beat her as well. Officers found the house to be "gross, disgusting, with an odor of fecal material." Dirty clothing and mattresses were on the floor.

4. Prior to this time, on August 5, 1992, CYFD received a referral concerning "subhuman conditions" at the home; on October 5, 1992 concerning abuse and neglect of the children; on December 11, 1992 concerning abuse of Joan by Parents; and on March 29, 1993 concerning the children's attendance in school and the fact that Father had threatened a neighbor by pointing a shotgun at him. Investigation of the first referral revealed that the house and yard were cluttered and dirty. The social worker observed beer bottles and cans, but was unable to determine to whom they belonged. Investigation of the second referral revealed that the house and yard were still cluttered and dirty. Several bags of beer cans were in the yard. There was very little food in the cupboards and a pellet gun and rifle were observed in the living room. Although it is unclear from the record whether the third referral was investigated, Wheeler reported that Joan ran away from home and did not want to return, so she was placed in foster care. During her foster placement, Joan manifested emotional problems and was admitted to a psychiatric treatment hospital. During the evaluation process, Joan expressed extreme anger toward her family, described a detailed plan to kill Father, and alleged that her brothers fondled her younger sisters and Mother. At that time, Joan stated that she never wanted to return home. It appears that the fourth referral was not investigated because CYFD was already involved with the family at that time and it was felt that an investigation would not have revealed any new information.

5. On April 15, 1993, CYFD received another referral stating that Father and his fifteen-year-old son, David Jr., came out of their house with baseball bats and attempted to hit a group of children who were outside playing ball. Both were reported to be drunk at the time. The source also reported that Parents and their older children, David Jr., Annette, Joan, and Jesse, frequently drank and used foul language. It was further reported that the children were not attending school and were dirty most of the time. Wheeler later reported that Annette and David Jr. had not attended school for over a year and that, as of April 1993, neither had started to work toward a GED. She further reported that Joan was not in school during the entire 1993 spring semester and attended approximately half of the 1992 fall semester. The elementary school that Jesse and Joanne were attending made several reports stating that they came to school three days a week at most, arriving at 9:30 a.m. and usually leaving by 12:00 p.m.

6. CYFD filed a petition alleging neglect or abuse or both against Appellants on April 22, 1993. Having determined that the children were in immediate danger from their surroundings and that their removal from the home was necessary to insure their safety and welfare, the children were again placed in the physical custody of CYFD on April 23, 1993, pursuant to an ex parte order. Five of the seven children were placed into CYFD custody, but the remaining two children were not placed in substitute care because it was felt that due to their ages, they were not in immediate danger.

7. On April 28, 1993, a custody hearing was conducted and the court ordered that the children remain in CYFD custody and adopted CYFD's interim assessment plan. Pursuant to a stipulated adjudication and dispositional judgment entered on July 29, 1993, the children were adjudicated to be neglected or abused or both. The court ordered that CYFD implement its submitted treatment plan dated July 7, 1993, and that Parents cooperate with and participate fully in the treatment plan. The treatment plan required Parents to participate in therapy for domestic violence; to abstain from alcohol and drug use and participate in random alcohol and drug testing; to engage in individual and family therapy; to seek employment or financial resources to provide for family needs; and to attend Alcoholics Anonymous (AA) meetings.

8. On October 15, 1993, CYFD moved the court for a periodic review of the July 1993 dispositional judgment. In November 1993, members of the New Mexico Citizen Review Board (the Board) met with Parents and three of the CYFD social workers assigned to Parents' case. At that time, CYFD had a return-home plan for the children which meant that CYFD was to make reasonable efforts toward unification of the family in a timely manner. The Board did not agree with CYFD's recommendation.

9. The periodic review was conducted on December 15, 1993. In its dispositional order, entered on February 10, 1994, the court adopted the judicial review report prepared by CYFD. That report stated that Parents continued to deny that abuse and neglect of their children had occurred, that Parents had minimally complied with treatment recommendations, and that CYFD was concerned with the overall lack of progress that the family had made after two years of intervention. Consequently, CYFD recommended to the court that the children remain in CYFD custody and that reunification be contingent upon Parents' progress and participation in the treatment plan. The court found that it was "in the best interests of the children that they remain in the legal and physical custody of [CYFD]" and implemented CYFD's proposed treatment plan, as amended.

10. At some point in late November or early December of 1993, CYFD made a decision to retreat from its original return-home plan and filed a motion for termination of parental rights in February 1994. At that time, Mother was pregnant with Parents' eighth child. Based upon the family's prior history, CYFD filed an amended neglect/abuse petition to include the eighth child, Cheyenne. After Cheyenne was born, she was immediately taken into emergency protective custody by the Santa Fe Police Department and placed in the physical custody of CYFD. In support of its amended

neglect/abuse petition, CYFD submitted an affidavit prepared by Mark Ruttkay, a social worker assigned to the case, which detailed the referrals and resulting investigations of the home. In the affidavit, Ruttkay concluded that there was probable cause to believe that Cheyenne would be in immediate danger if left in Parents' custody. The district court entered an ex parte custody order, ordering that Cheyenne be placed in the protective custody of CYFD.

11. The motion for termination of parental rights was made as to the four youngest of the eight children—which included Joanne, Laura Lee, Billy Jack, and Cheyenne. District Judge Steve Herrera presided over the termination proceedings. The district court made findings regarding expert testimony of Parents' psychological evaluations, social worker's testimony of treatment efforts, and the family's compliance with, and progress in, treatment. The court concluded that CYFD proved by clear and convincing evidence that Joanne, Laura Lee, Billy Jack, and Cheyenne were neglected or abused children as defined in the Abuse and Neglect Act, § 32A–4–2(B) & (C), as a result of the violent, chaotic, and sociopathic behavior of Parents. The court further concluded that CYFD proved by clear and convincing evidence that CYFD and their agencies had made more than reasonable efforts to assist Parents in changing their behavior, but that CYFD had shown by uncontradicted expert testimony that Parents have characterological disorders which make it extremely unlikely that they will be able to change their behavior in the foreseeable future. The court also found that although no motion was made for termination of parental rights regarding Annette, David Jr., Joan, and Jesse, they were adjudicated to be abused or neglected or both.

12. Following the termination proceedings, counsel for Parents filed a motion to withdraw as their attorney. Prior to the hearing on counsel's motion to withdraw, the case was transferred to District Judge Michael E. Vigil. A hearing on counsel's motion to withdraw was held on November 15, 1994, at which time Parents concurred in the motion and stated for the record some of their concerns regarding ineffective assis-

tance of counsel. The court entered an order on November 30, 1994 granting counsel's motion to withdraw, contingent upon his completion of certain tasks, including the filing of a notice of appeal and docketing statement preserving Parents' claims.

## II. DISCUSSION

### A. Ineffective Assistance of Counsel

#### 1. Requirement of Evidentiary Hearing at Trial

█ 13. Parents first raised the issue of ineffective assistance of counsel at the hearing on their trial counsel's motion to withdraw. Parents' main contentions on appeal are that (1) Judge Vigil was not the trial judge at the termination proceeding, and as such, was not in a position to determine whether Parents' allegations of ineffective assistance of counsel merited an evidentiary hearing; and (2) Parents were not informed that the hearing concerning withdrawal of their counsel would be their only opportunity to voice their concerns regarding their counsel's representation. As a result, Parents assert that their procedural due process rights were violated.

14. Parents rely on *In re Termination of the Parental Rights of James W.H.*, 115 N.M. 256, 849 P.2d 1079 (Ct.App.), *cert. denied*, 115 N.M. 545, 854 P.2d 872 (1993), to support their position that the district court was required to hold an evidentiary hearing on their claim of ineffective assistance of counsel. However, that case merely recommends and encourages trial judges to inquire into the adequacy of counsel following a termination proceeding. *Id.* at 258, 849 P.2d at 1081. It would be preferable for the trial judge that heard the entire proceedings below to conduct a hearing on ineffective assistance of counsel when there are specific allegations meriting such a hearing. However, contrary to Parents' contention, *James W.H.* does not mandate that such a hearing be conducted.

15. In *James W.H.*, we stated that:

[W]e encourage the trial judge to inquire of a parent, who has been represented by appointed counsel, immediately after terminating parental rights whether that par-

ent has any concerns about the representation provided by counsel. Under our holding that a parent represented by appointed counsel has a right to effective counsel, we conclude that the trial judge has an obligation to facilitate the resolution of the issue of whether that parent has received effective assistance of counsel by holding an evidentiary hearing if he or she expresses concerns that merit such a hearing. For this reason, we recommend an inquiry by the trial judge prior to entering a written judgment. We recognize that a parent may have a difficult time expressing his or her concerns at this time, but we believe that in the interests of the child or children who are involved, an inquiry is desirable, because if concerns are expressed, then an early resolution of those concerns would be appropriate.

*Id.*

16. Here, Judge Herrera, the trial judge presiding over the termination proceeding, did not inquire of Parents whether they had any concerns about their counsel's representation. It was not until trial counsel filed a motion to withdraw that the issue of ineffective assistance of counsel became known to the court. By that time, the case had been transferred to Judge Vigil. At the hearing on counsel's motion to withdraw, Parents were given an opportunity to voice their concerns regarding ineffective assistance of counsel. The only allegation raised by Parents was that trial counsel failed to call witnesses whom they believe would have provided favorable testimony. Merely raising a question of ineffective assistance of counsel, however, did not automatically entitle Parents to an evidentiary hearing. Rather, Parents were required to raise concerns that merited an evidentiary hearing. *See id.* In response to Parents' allegation, counsel stated that he interviewed some witnesses whom he believed would hurt Parents' case, and as a matter of trial tactics, decided not to call them as witnesses. Based upon this exchange, the district court apparently did not believe that Parents' allegation raised serious concerns meriting an evidentiary hearing.

17. We have previously held that it is not reversible error for the trial court to fail to conduct an evidentiary hearing, since a party may raise the issue of ineffective assistance of counsel for the first time on direct appeal. *Id.* at 257, 849 P.2d at 1080. Consequently, there was no due process violation in Judge Herrera's failure to inquire if Parents had concerns regarding ineffective assistance of counsel at the termination proceeding. Similarly, Parents' procedural due process rights were not violated as a result of not being informed that the motion hearing would be their only opportunity in district court to voice their concerns regarding ineffective assistance of counsel.

18. Nevertheless, we reiterate that we strongly encourage trial judges to inquire of parents who have been represented by appointed counsel in a termination proceeding whether they have any concerns about ineffective assistance of counsel prior to entering a written judgment. Moreover, it would be to CYFD's advantage, and to the advantage of the children whose best interests they represent, if CYFD's attorneys alerted the trial courts to the desirability of engaging in such an inquiry in a timely fashion.

## 2. Remand for Evidentiary Hearing on Appeal

19. Parents contend that remand for an evidentiary hearing is necessary before this Court can review claims of ineffective assistance of counsel on direct appeal. We do not agree. Parents cite several criminal cases in support of their contention that they were entitled to an evidentiary hearing. In *James W.H.*, 115 N.M. at 259, 849 P.2d at 1082, we noted the inadvisability of importing criminal law concepts into the juvenile law area. Nonetheless, we analyzed that case using the standards from criminal cases because the result would not be different using a different standard. *Id.* The same is true in this case.

20. The criminal standard for ineffective assistance of counsel is whether counsel was reasonably competent and whether defendant was prejudiced as a result of the incompetence. *Id.* A remand for an evidentiary hearing is required only when the exist-

ing record on appeal makes out a prima facie case of ineffective assistance of counsel. *State v. Stenz*, 109 N.M. 536, 539, 787 P.2d 455, 458 (Ct.App.), *cert. denied*, 109 N.M. 562, 787 P.2d 842 (1990). A prima facie case is made out when: (1) it appears from the record that counsel acted unreasonably; (2) the appellate court cannot think of a plausible, rational strategy or tactic to explain counsel's conduct; and (3) the actions of counsel are prejudicial. *See State v. Richardson*, 114 N.M. 725, 729, 845 P.2d 819, 823 (Ct.App.), *cert. denied*, 114 N.M. 550, 844 P.2d 130 (1992).

21. In *James W.H.*, we relied on *State ex rel. Juvenile Dep't v. Geist*, 310 Or. 176, 796 P.2d 1193 (1990), as an example of a case utilizing a different standard from that utilized in criminal cases. Under *Geist*, an appellate court should remand for an evidentiary hearing only where the complaining parent "raises a *substantial* question concerning issues other than those adjudicated at the termination proceeding." *Id.* 796 P.2d at 1204 n. 16. In order to raise a substantial question, a parent has the burden of making specific allegations, including the name of the witness and substance of the testimony and how that testimony would show that counsel was ineffective. *Id.*

22. In this case, as will be seen, we are not persuaded that remand to the trial court is required under either standard. We are not persuaded that a prima facie case of ineffectiveness has been established or that remand would produce further evidence to establish counsel's ineffectiveness or that any such ineffectiveness affected the outcome of the termination proceedings. Consequently, we review the claim of ineffective assistance of counsel on direct appeal based on the record before us.

### 3. Standard of Review

23. In *James W.H.*, we discussed the standard to be used in measuring ineffective assistance of counsel. 115 N.M. at 259, 849 P.2d at 1082. We noted that a majority of jurisdictions apply the standard used in criminal cases, but also cited contrary authority. *Id.* In the end, we determined that it was not necessary to decide in that case which

standard to apply since even under the criminal law standard, the claim lacked merit. *Id.* The same is true in this case.

### 4. Merits of Claim

24. In reviewing a claim of ineffective assistance of counsel, we look at the proceedings as a whole. *Richardson*, 114 N.M. at 727, 845 P.2d at 821; *see also Geist*, 796 P.2d at 1203 (appellate court looks at totality of circumstances). Litigants alleging ineffective assistance of counsel have the burden of establishing the claim and are required to show not only that trial counsel was ineffective, but that trial counsel's inadequacies prejudiced them. *Richardson*, 114 N.M. at 727, 845 P.2d at 821; *see also Geist*, 796 P.2d at 1203–04.

25. On appeal in this case, Parents assert allegations concerning: (1) counsel's failure to offer evidence, in the form of testimony and documentation, such as videotapes of family visits, police records to prove that they were not the instigators of neighborhood incidents, evidence of attendance at AA meetings, and documentation of the lack of proceedings against the family in their former residence; (2) counsel's failure to investigate Parents' representations that their drug and alcohol test results were favorable to them and offer such evidence; (3) counsel's failure to vigorously contest the taking into protective custody of Cheyenne at birth; (4) counsel's failure to object to the admission of photographs of injuries of Mother taken without her consent; (5) counsel's failure to call three particular witnesses whose testimony would have been favorable to Parents, as well as counsel's failure to call expert witnesses to offset those called by CYFD; and (6) counsel's failure to ask specific questions on cross-examination regarding abuse and neglect to demonstrate the weakness of CYFD's case.

26. After reviewing the record of the termination proceedings, we hold that Parents fail to demonstrate how counsel's failure to offer into evidence videotapes of family visits would have affected the outcome of the proceeding in light of the unfavorable testimony presented at trial. Wheeler testified

that she observed approximately twenty home visits with the family which she described as chaotic at best. Wheeler further testified that Parents rarely attempted to assert disciplinary control over the children.

■ 27. As to the police records, trial counsel may have determined that offering police records into evidence indicating that the family was continuously involved in neighborhood incidents which prompted calls to the police may have been detrimental to Parents. In addition, while cross-examining Sergeant Daniel Gonzales about the thirty-eight police reports involving the family, counsel elicited the admission that some of the calls were in fact initiated by the family because of some danger they feared. With regard to documentation of AA meeting attendance, it appears that reports signed by individuals from AA verifying Parents' attendance at the AA meetings were admitted at trial without objection. Also, we fail to see how lack of proceedings against the family in their former residence was relevant to the proceedings at issue or how admitting this evidence would have affected the outcome of the proceedings.

28. We are unconvinced by Parents' allegation that their attorney failed to investigate Parents' representations that their drug and alcohol test results were favorable to them. There was evidence in the record that as of June 10, 1994, ten days before the hearing on the termination proceedings, no drug screens had been completed because a picture I.D. was required, and Parents had not obtained one. In any event, it was Parents' obligation to provide CYFD with proof of compliance with the treatment plan.

■ 29. With regard to counsel's failure to vigorously contest the taking into protective custody of Cheyenne at birth, there was nothing counsel could have done to prevent this particular event. Pursuant to NMSA 1978, Section 32A–3B–3(A)(4) (Repl. Pamp.1995), a law enforcement officer may take a child into protective custody without a court order when the officer has reasonable grounds to believe that "the child is endangered by his surroundings and removal from those surroundings is necessary to ensure the child's safety." Once CYFD filed its amended neglect/abuse petition with regard to Cheyenne, the "district court may issue an ex-parte custody order based upon a sworn written statement of facts showing that probable cause exists to believe that protective custody of the child is necessary." NMSA 1978, § 32A–3B–4(E) (Repl.Pamp.1995). Here, CYFD submitted a sworn written statement by Ruttkay in support of its request and the district court entered an ex parte custody order. Moreover, it is not known whether counsel was even notified of CYFD's plan to take Cheyenne into protective custody until after the fact.

■ 30. Concerning counsel's failure to object to the admission of photographs of injuries of Mother taken without her consent, Parents fail to indicate on what basis an objection could have been made. Certainly the pictures were relevant to the issue of extreme violence in the home, and CYFD properly established foundation and chain of custody. When CYFD sought to admit the photographs, Parents' counsel did voir dire Sergeant Gonzales to question their admissibility.

31. Finally, the allegations regarding counsel's failure to call certain witnesses and ask specific questions on cross-examination concern tactical decisions that we will not second-guess on appeal. *See State v. Dean*, 105 N.M. 5, 8, 727 P.2d 944, 947 (Ct.App.), *certs. denied*, 104 N.M. 702, 726 P.2d 856 (1986). Thus, considering the proceedings as a whole, we conclude that trial counsel was not ineffective. In fact, the record shows that counsel vigorously represented Parents by interviewing witnesses, effectively cross-examining CYFD's witnesses, focusing on the objectives of the treatment plan that Parents did accomplish, and calling witnesses in support of Parents' case.

**B.** *Clear and Convincing Evidence*

32. Parents assert that the record on appeal is not sufficient to determine whether clear and convincing evidence supports the termination of parental rights, due to ineffective assistance of counsel that resulted in various omissions that are not apparent on the record. Parents contend that the omis-

**350**

sion of favorable evidence distorts the record giving the impression that the weight of evidence was against them. Having determined that Parents were not denied effective assistance of counsel, we view the evidence in the record as it was presented to the trial court.

33. The Abuse and Neglect Act provides that the court shall terminate parental rights when

> the child has been a neglected or abused child ... and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by the department or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child.

Section 32A–4–28(B)(2). Section 32A–4–28(A) requires that "[i]n proceedings to terminate parental rights, the court shall give primary consideration to the physical, mental and emotional welfare and needs of the child." A "neglected child" is defined, in relevant part, as a child "who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, ... or the neglect or refusal of the parent, ... when able to do so, to provide them." Section 32A–4–2(C)(2).

34. On appeal, we view the evidence in the light most favorable to support the trial court's findings and conclusions of law. *In re Termination of Parental Rights of Reuben & Elizabeth O.*, 104 N.M. 644, 647, 725 P.2d 844, 847 (Ct.App.1986). The standard of proof in cases involving the termination of parental rights is whether the grounds relied upon by the trial court in terminating a parent's rights have been proven by clear and convincing evidence. *In re Termination of the Parental Rights of Eventyr J.*, 120 N.M. 463, 466, 902 P.2d 1066, 1069 (Ct.App.), *cert. denied*, 120 N.M. 394, 902 P.2d 76 (1995). Clear and convincing evidence consists of "proof stronger than a mere 'preponderance' and yet something less than 'beyond a reasonable doubt.'" *In re Adoption of Doe*, 98 N.M. 340, 345, 648 P.2d 798, 803 (Ct.App.), *cert. denied*, 98 N.M. 336,

648 P.2d 794 (1982). Our task on appeal is to determine whether, viewing the evidence in the light most favorable to CYFD, the trial court could properly determine whether the clear and convincing standard was met. *In re R.W.*, 108 N.M. 332, 334–36, 772 P.2d 366, 368–70 (Ct.App.), *certs. denied*, 108 N.M. 273, 771 P.2d 981 (1989).

35. In this case, the trial court could properly find that CYFD's allegations regarding Parents' neglect or abuse or both were supported by clear and convincing evidence. There was ample evidence that the children were neglected, that CYFD made reasonable efforts to assist Parents in rehabilitating themselves, and that the causes for the neglect were unlikely to change in the foreseeable future.

36. As shown by the evidence, the children were neglected as defined by the Abuse and Neglect Act. *See* § 32A–4–2(C). There is evidence that with respect to Joanne, educational performance while at home was below standard, due to lack of attendance, defiance of authority, and poor cooperation with peers and teachers. With respect to the four older children who were left in the home and not made subject to the motion for termination of parental rights, there were similar problems of educational neglect. Joan was expelled from school for lack of attendance, Jesse stopped attending when CYFD ordered him to treatment, and Annette and David Jr. had not been in school for several years. Laura Lee was afraid of going to day care and experienced bed wetting, which increased in frequency the day before home visits and became even worse after home visits. With respect to Billy Jack, there was evidence that he had bald patches on the back of his head, indicating that he was left to lie for long periods of time. CYFD also had reports from Billy Jack's pediatrician that they were beginning to see some evidence of fetal alcohol syndrome in Billy Jack at four months of age. While in foster care, the children's foster parents noticed that the children had poor hygiene habits, not knowing how to use soap or shampoo, and fearing water. Jesse had been addicted to alcohol, gasoline, and drugs, including cocaine and marijuana, and needed residential treatment

partly because of the educational neglect by Parents. Even more disturbing was the evidence of admitted sexual abuse of Annette by Father in 1990 and the alleged sexual abuse of Mother in 1993, also by Father, which was later denied. With regard to Cheyenne, although she was taken into CYFD custody at the time of birth, and was therefore never in Parents' care, the court could rely on evidence of neglect or abuse to the other children as a factor in determining whether parental rights to Cheyenne should be terminated. *See In re Termination of Parental Rights of Sherry C. & John M.*, 113 N.M. 201, 208, 824 P.2d 341, 348 (Ct.App. 1991). "Under our statutes, it is not necessary to wait until a child has been injured, since knowingly, intentionally, or negligently placing a child in danger constitutes abuse under Section [32A–4–2(B) ], and is a ground for terminating parental rights." *In re Termination of Parental Rights with Respect to I.N.M. & A.F.E.*, 105 N.M. 664, 669, 735 P.2d 1170, 1175 (Ct.App.1987).

37. There was evidence that CYFD made reasonable efforts to assist Parents in rehabilitating themselves. CYFD began providing services to the family in 1990, when the children were initially placed in CYFD custody. When the children were returned home in mid–1991, services were put in place to provide continued intensive work and needed supervision. CYFD continued to work with the family on a voluntary basis while the children were in the home. In 1993, when the children were again placed in CYFD custody, CYFD hoped to reunite the family by returning the children home and continuing to provide services to make it safe for the children so that they could remain at home with their family.

38. However, Parents' compliance with the court-ordered treatment plan was described as minimal, at best. Parents made excuses for failing to show up at appointments for therapy and sometimes made initial contact with referred programs but then failed to follow up, blaming CYFD for not providing the necessary paperwork. Parents were not permitted to participate in programs for domestic violence because they continually denied that there was a problem of domestic violence in the home. Father admitted to sexually abusing Annette, but denied that he ever hurt Mother or physically abused the other children. Mother denied Father had physically and sexually abused her in April 1993. Moreover, there was evidence from one child that Father continued to drink alcohol beginning at five on Friday when CYFD's offices closed until Monday morning when they opened.

39. There was evidence that the causes for the neglect were unlikely to change in the foreseeable future. Two expert witnesses for CYFD, who performed psychological evaluations on Parents, testified at the termination proceedings. The first, Dr. Richard Fink, described Parents as self-focused and unable to understand the needs of their children. He testified that Parents stated whatever seemed to work at that moment without regard to what was said before or what might have to be said later. Dr. Fink further testified that although he had not seen Parents since their evaluation in 1990, at that time, their prognosis for change was a "long shot." The second, Dr. Warren Steinman, who prepared psychological evaluation reports of Parents in May 1993, testified to much of the same behaviors. In addition, Dr. Steinman testified that Parents have difficulty admitting that their problems arise at home, and instead tend to project the blame onto others outside of the home. Dr. Steinman testified that because Parents possessed characterological disorders which developed over a long period of time, change required resocialization, a rebuilding of personality, and a realization that there was a need for change, which Parents lacked. Thus, Parents' prognosis for a meaningful change in a year to two years was quite poor.

40. On the other hand, there was also conflicting evidence in Parents' favor. There was evidence that Parents were attending AA meetings regularly and that they had both obtained AA sponsors as the treatment plan requested. Father was participating in individual therapy with Wayne Quilico, a social worker, at the family's home to deal with the issues of alcohol and sexual abuse. Quilico also worked with Parents to help them deal with domestic violence by introducing

them to better means of communicating. Quilico further testified that Father ceased alcohol abuse with the exception of four times, that he knew of, when Father "slipped" and drank alcohol. There was also testimony that Father was working consistently out of the home, as a handy man on an on-call basis, and seeing a tutor to improve his reading and writing skills.

41. Nevertheless, having carefully reviewed the evidence in the light most favorable to support the judgment, *see In re Reuben & Elizabeth O.*, 104 N.M. at 647–48, 725 P.2d at 847–48, and recognizing that we are not permitted to reweigh the evidence on appeal, *see In re R.W.*, 108 N.M. at 335, 772 P.2d at 369, we conclude that the trial court could properly find that the grounds supporting termination of parental rights were proved by clear and convincing evidence.

### III. *CONCLUSION*

42. For the foregoing reasons, we affirm the district court's order terminating Parents' parental rights.

43. **IT IS SO ORDERED.**

PICKARD and BUSTAMANTE, JJ., concur.