2003-NMCA-068

68 P.3d 199

STATE of New Mexico ex rel. CHILDREN, YOUTH AND FAMILIES DEPARTMENT, Plaintiff–Appellee,

v.

CHRISTOPHER L., Respondent–Appellant,

and

Concerning In the Matter of Christopher L., a Child.

No. 22,165.

Court of Appeals of New Mexico.

March 19, 2003.

Angela L. Adams, Chief Children's Court Attorney, Daniel J. Pearlman, Children's Court Attorney, New Mexico Children, Youth & Families Dept., Santa Fe, NM, for Appellee.

Jane Bloom Yohalem, Santa Fe, NM, for Appellant.

## OPINION

CASTILLO, Judge.

{1} Christopher L. (Father) appeals from a judgment terminating his parental rights to his minor son, Christopher L. (Child). Father, who was incarcerated at the time his rights were terminated, raises three issues in his appeal: (1) that he was denied due process at the termination hearing; (2) that he did not waive his right to participate in the

hearing; and (3) that the district court improperly relied on a default adjudication order, adjudicating Child neglected, when it terminated Father's parental rights. We hold that Father was provided with due process at the termination hearing because he was given the opportunity to appear telephonically, but that he waived his right to participate in the hearing by hanging up the telephone. We also hold that the district court's judgment terminating Father's parental rights was not based on the prior adjudication, but was supported by clear and convincing evidence introduced at the hearing. Accordingly, we affirm the judgment terminating Father's parental rights.

## BACKGROUND

### Events Before Termination Hearing

{2} At the time Child was taken into the custody of the Children, Youth and Families Department (the Department) on August 28, 1998, Father was incarcerated in Estancia, New Mexico. Mother, who subsequently relinquished her parental rights, had left Child with a non-relative caretaker and disappeared. On October 30, 1998, a hearing was held on the petition alleging abuse and neglect (October hearing). There is no taped transcript of what occurred at this hearing, but the adjudication and disposition order, entered after the hearing, states that Father's trial counsel proffered a written plea of no contest to the allegations on Father's behalf. The proffered plea was not signed by Father and Father did not appear in person at the hearing. The parties stipulated to continue the hearing as to Father and agreed that a second adjudication setting would be requested for Father if his written plea was not received by the court and the parties by November 30, 1998.

{3} On February 10, 1999, the district court held both a judicial review and the continued hearing on the allegations in the abuse and neglect petition (February hearing). Father did not attend this hearing, and Father's appellate counsel represents that trial counsel never sought a transport order. Although the parties provide different renditions of what happened at this hearing, the taped transcript reveals the following facts. Father's attorney had not submitted either a signed plea or a request for setting before the judicial review. Father's trial counsel told the district court that after the October hearing he had sent the documents to Father in Estancia, where he was then incarcerated, but that Father had not returned the plea documents to him. Father's trial counsel explained that Father had been transferred to Hobbs on January 4, 1999, and continued to be incarcerated there. Father's trial counsel told the district court that it may not have been Father's fault that the documents were not returned. The district court stated that three months was long enough for Father to return his plea, which trial counsel had represented at the October hearing would be done. The district court then entered a default adjudication order against Father as to the adjudication portion of the hearing. While the order entered after the February hearing also determined issues based on the initial judicial review of the case, we will refer to it as the default adjudication order for purposes of this opinion.

{4} Father's trial counsel neither appealed nor moved to set aside the default judgment, and withdrew about a month after the default adjudication order was entered. Nor did Father's new, substituted counsel seek relief from the default adjudication order. In the default adjudication order, the district court implemented the Department's treatment plan and also ordered that Father not correspond with Child unless so recommended by a therapist. Father was not prohibited from contacting Child's caregivers or the social workers about Child's condition and welfare. The treatment plan also required Father to undergo a drug/alcohol assessment and to undergo substance abuse and parenting classes if provided in the jail facility.

{5} At a permanency hearing on May 1, 2000, during which the district court was considering Child's placement with his grandmother in Germany, Father informed the district court that he was due to be released from incarceration and placed on parole on May 27, 2000. Consequently, the district court required the Department to put a treatment plan in place so that Father could immediately begin treatment upon his release. The plan required Father to take

daily drug tests, attend three Alcoholics Anonymous or Narcotics Anonymous meetings per week, take parenting classes, have a psychological evaluation conducted, and find employment. Father was released on May 22, 2000, five days before originally anticipated. However, within hours of his release on May 22, 2000, Father was arrested for violating the conditions of parole.

{6} On August 4, 2000, the Department filed a motion to terminate the rights of Child's parents including Father. On October 27, 2000, the district court held a hearing at which it granted the Department's motion to change the placement of Child and his siblings, placing them in the home of their relatives in Germany. Father did not attend this placement hearing but was represented by a substitute for his attorney, who represented to the district court that Father had told his primary attorney that he did not want to be transported for the placement hearing, although Father later denied this.

**Termination Hearing**

{7} On November 16, 2000, the district court heard the Department's motion to terminate Father's parental rights. Although Father's trial counsel had delivered a transport order to the Sheriff's office at Bernalillo County Detention Center, the facility in Lea County, where Father was being held, had not received it. Father was then contacted in Lea County so that he could attend the hearing telephonically. At the termination hearing, Father insisted that he had the right to be present in the courtroom, interrupted the court, and claimed his counsel was ineffective. The district court tried to explain the situation to Father and responded to his requests. Father then cursed the judge and hung up the telephone.

{8} The termination hearing continued without Father's participation. At the hearing, a social worker for the Department provided extensive testimony. She introduced exhibits showing that Father was incarcerated at the time his son was taken into custody on August 28, 1998, and apart from a few hours on May 22, 2000, had been incarcerated almost the entire time that Child had been in the Department's custody, and that his

police record went back to 1986. The social worker testified that Father had told her that he had been addicted to heroin when Child was born and that Mother also became addicted when Father could not break the habit. The social worker also testified that Father's employment history consisted of a series of jobs and that he did not stay in any one job for very long.

{9} The social worker emphasized that at the permanency hearing held on May 1, 2000, Father had informed the district court that he was due to be released soon and sought a chance to change his life and get custody of Child. As described before, the district court put an extensive treatment plan in place but Father, upon his release, chose to ignore the plan and immediately violated the conditions of his parole resulting in his reincarceration. In addition, the district court heard that Child had special needs and was on medication for depression and asthma, that his behavior improved when he had visited his grandmother in Germany, and that it was in his best interest to be placed with his sisters, who were already living with their grandmother. The social worker testified that Child had been abandoned, that Father made no attempt to contact her as Child's social worker or those caring for Child to check on his well-being. The social worker also testified that Father had not provided any financial support, that his continual incarceration had prevented the formation of a parent-child bond, and that it was in Child's best interest to terminate Father's parental rights.

{10} The district court also heard evidence from the coordinator of the group home where Child was living. The coordinator testified that Child needed permanency, consistency, a placement with his siblings, and that termination of Father's parental rights and placement of Child with his extended family was in Child's best interest. The coordinator also informed the district court that Father never asked her about Child's welfare and did not have the skills to parent this Child.

{11} As of the date of the termination hearing on November 16, 2000, Child had been in the Department's custody for over two years with no support from Father. In a

letter Father wrote to the district court before the hearing, he told the district court that he was not due to be released until June 2001 and asked the court to postpone any action on Child to allow Father to do what was required to have custody returned to him. Based on the letter, any possibility of support would not occur for at least an additional six-month period.

{12} In the judgment terminating Father's parental rights, in addition to finding that a default adjudication order had been entered against Father, the district court found that the parent-child relationship had disintegrated, and that Child had lived with others for an extended period of time. The district court also found that Father had been given ample opportunity to comply with treatment efforts, as well as the opportunity to establish a relationship with Child and to contact both the social worker and the group home to inquire about Child's welfare, but had not done so. In addition, the district court found that Father had abandoned Child, demonstrating his inability to parent, and that termination of the parental rights of Father was in Child's best interest.

## DISCUSSION

{13} Father raises three issues on appeal: (1) that he was denied due process at the termination hearing; (2) that he did not waive his right to participate in the hearing; and (3) that the district court improperly relied on a default adjudication order, adjudicating Child neglected, when it terminated Father's parental rights.

### Due Process

{14} Father argues that under the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and applied by this Court to termination proceedings in *State ex rel. Children, Youth & Families Dep't v. Ruth Anne E.*, 1999–NMCA–035, ¶ 23, 126 N.M. 670, 974 P.2d 164, he was denied due process when he was not given the opportunity to be physically present in the courtroom during the termination hearing. "[I]n passing upon claims that the procedure utilized below resulted in a denial of procedural due process, we review such issues de novo." *Id.* ¶ 22.

{15} It is well established that "due process is a ... malleable principle which must be molded to the particular situation, considering both the rights of the parties and governmental interests involved." *In re Valdez*, 88 N.M. 338, 341, 540 P.2d 818, 821 (1975). In the context of termination cases, the *Mathews* due process test requires that we consider (1) a parent's significant interest affected by the proceeding, (2) the value of additional safeguards and the risk of an erroneous deprivation unless alternative arrangements are made, and (3) the State's vital interest in protecting the welfare of children. *See Ruth Anne E.*, 1999–NMCA–035, ¶ 23, 126 N.M. 670, 974 P.2d 164. In this case, as in *State ex rel. Children, Youth & Families Dep't v. Anne McD.*, 2000–NMCA–020, ¶ 24, 128 N.M. 618, 995 P.2d 1060, "[i]n balancing the parent's rights and interest and the State's rights and interest ..., the determinative factor is the second prong of the *Mathews* test," balancing the risk of error with the value of additional safeguards.

{16} In *Ruth Anne E.*, the father was not present at the hearing on the termination of his parental rights because he was incarcerated in another state. 1999–NMCA–035, ¶ 7, 14, 126 N.M. 670, 974 P.2d 164. In that case, we held that the father had been denied procedural due process and emphasized that alternative arrangements could have been made to allow the father "meaningful participation in the hearing." *Id.* ¶¶ 27, 29. We stated that either a brief continuance could have been granted to see if the father was released from jail, or that the father could have participated by telephone, after having been "given an opportunity to review the evidence, [and] discuss it with his attorney." *Id.* ¶ 29.

{17} In the case before us, because the district court was aware that Father had not been transported for the termination hearing as ordered, Father was given the opportunity to participate on the telephone. However, Father insisted that he be physically present in the courtroom. The district court explained to Father that because the court docket was crowded, a continuance would result in too long of a delay, that the termi-

nation hearing was scheduled for that day, and that Father was being given the opportunity to participate on the telephone. It is clear from the record of the termination hearing that the district court provided Father with an opportunity to be present on the telephone during the hearing. In addition, when Father complained about not having spoken with his attorney, the district court asked Father if he wanted time to speak with his attorney before the hearing began. Throughout this process, instead of responding directly to the district court's questions, Father repeatedly asserted that he wanted to be in the courtroom, and that he was not satisfied with the alternative procedure provided. The district court explained to Father that the termination hearing could not be rescheduled in a timely manner and that it was important to have the hearing that day. The district court also told Father that his disruptive behavior would not be tolerated.

{18} Father argues that under the *Mathews* balancing test, allowing Father to be physically present would have prevented the risk of an erroneous deprivation and would not have unduly burdened the State. Father argues that his absence from the courtroom would have interfered with his ability to communicate with counsel during cross-examination. We are not persuaded that in this case, Father's telephonic appearance would have resulted in an erroneous deprivation. As the State points out, there was clear and convincing evidence introduced at trial to support the district court's findings that Father had abandoned Child, could not take care of him, that the parent-child relationship had disintegrated as a result of Father's actions, that further efforts to assist Father would be futile, and that terminating Father's rights was in Child's best interest. Moreover, Father's arguments regarding the importance of his presence in the courtroom are speculative since he decided to hang up the telephone and not participate at all.

{19} Father then argues that, unlike the parent in *Ruth Anne E.*, he was incarcerated in-state, and that, therefore, the potential delay to the proceedings would have been minimal. Father also argues that Child's interests would not be seriously affected by a brief delay because Child was already living in Germany with his grandmother and sisters. A further delay in this case, however, would not simply have resulted in a scheduling inconvenience for the State; it would also have resulted in further lack of stability and permanency for Child. As we pointed out in *Ruth Anne E.*, the State has a "vital interest in protecting the welfare of children." 1999–NMCA–035, ¶ 23, 126 N.M. 670, 974 P.2d 164. We also stated that "cases involving the termination of parental rights should be expeditiously concluded, that the need for finality in these cases is great, and that it is important that the children involved have a sense of stability and permanence in their lives." *Id.* ¶ 30.

{20} As the State points out, in termination hearings, "the court shall give primary consideration to the physical, mental and emotional welfare and needs of the child." NMSA 1978, § 32A-4-28(A) (2001). At the end of the termination hearing, the district court observed that this had been a long case because the State had waited to see if Mother could recover from her drug addiction or if Father could stay out of jail. Neither occurred. By the time of the termination hearing, Child had been in the State's custody for over two years and had been placed in three different foster homes and twice at All Faiths Receiving Home.

{21} Under the procedures provided by the district court at the termination hearing, Father would have been permitted to use the telephone to consult with his attorney and to testify on his own behalf. In *Ruth Anne E.*, we suggested such procedures would be sufficient to prevent the risk of erroneous deprivation when a parent is incarcerated out of state. 1999–NMCA–035, ¶ 29, 126 N.M. 670, 974 P.2d 164. We see no principled reason to conclude that the procedures recommended in *Ruth Anne E.* would not satisfy due process in this case simply because Father was incarcerated in New Mexico and not in another state. Continuing the termination hearing to permit Father to appear in person would not have lowered the risk of an erroneous deprivation in this case. Thus when we weigh the State's interest in Child's welfare against Father's parental interest, we con-

clude the State's interest in expeditiously concluding this case in the best interest of Child was not outweighed in this case by the risk of an erroneous deprivation of Father's rights. We hold, therefore, that Father was not deprived of due process at the termination hearing.

### Waiver of Right to Participate in Termination Hearing

{22} Father argues that the district court erred when it treated his conduct at the termination hearing as an irrevocable waiver of his right to participate in the termination hearing. Father relies on two criminal cases, *State v. Corriz*, 86 N.M. 246, 522 P.2d 793 (1974), and *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), to argue that before excluding Father from the courtroom because of disruptive behavior, he should have been warned that an additional outburst would result in his exclusion, and then been given the opportunity to return if he could agree not to be disruptive. We agree with Father that these criminal cases are relevant because in New Mexico termination hearings, parents are frequently afforded the protections given to criminal defendants. *See* Judge Michael D. Bustamante, *Incorporating the Law of Criminal Procedure in Termination of Parental Rights Cases: Giving Children a Voice through Mathews v. Eldridge*, 32 N.M. L.Rev. 143, 163–79 (2002).

{23} Father acknowledges, however, that the district court found that Father "refused to participate in the proceedings by verbalizing profanities towards the Judge and then hanging up the phone." Further, as the State points out, Father was not excluded from the courtroom for disruptive behavior. Although the district court informed Father that if he continued to be disruptive the court was going to hang up the phone, Father and not the district court terminated the connection after cursing the court. Under such circumstances, as the United States Supreme Court stated in *Allen*, "there can be no doubt whatever that the governmental prerogative to proceed with a trial may not be defeated by conduct of the accused that prevents the trial from going forward." *Allen*, 397 U.S. at

349, 90 S.Ct. 1057 (Brennan, J., concurring). Even in criminal cases, defendants who voluntarily absent themselves from the courtroom have waived their right to be present. *Taylor v. United States*, 414 U.S. 17, 20, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973); *see also In re James Carton K., III*, 245 A.D.2d 374, 665 N.Y.S.2d 426, 429 (N.Y.App.Div.1997). Although Father argues that, unlike the defendant in *Taylor*, Father could not have returned to the courtroom, the basis of the *Taylor* holding was the voluntariness of the absence. There is no question that Father's hanging up the phone was voluntary, and there is no evidence that he either wanted or attempted to return to participate in the termination hearing.

{24} Therefore, we hold that the district court was not required, under the facts of this case, to make further efforts to assure that Father be present at the termination hearing after Father insulted the district court and voluntarily ended his participation in the hearing.

### Reliance on the Default Adjudication

{25} Father argues that it was unconstitutional for the district court to enter a default adjudication order against him on the allegations contained in the Department's petition for abuse or neglect and then to base the termination of his parental rights on the default adjudication. Father's appellate counsel suggests that Father may never have received the plea documents and thus should not have been held in default. The tape of the February hearing, however, does not lead to such a conclusion, and Father does not argue on appeal that his trial counsel was ineffective. No suggestion was made during the February hearing that Father had not received the plea documents, only that Father may not have been able to return them. In addition, Father did not seek to appeal or set aside the default adjudication order.

{26} Father relies on *State ex rel. Children, Youth & Families Dep't v. Stella P.*, 1999–NMCA–100, ¶ 24, 127 N.M. 699, 986 P.2d 495, and *State ex rel. Children, Youth & Families Dep't v. Steven R.*, 1999–NMCA–141, ¶ 12, 128 N.M. 304, 992 P.2d 317, to argue that the district court had an obli-

gation to ascertain that Father had voluntarily waived his due process right to appear at the adjudication hearing held on February 10, 1999. In *Stella P.,* this Court held that a mother was denied due process when her parental rights were terminated at a hearing that she did not attend and at which only a proffer was made of the evidence supporting the termination. 1999–NMCA–100, ¶¶ 31, 35, 127 N.M. 699, 986 P.2d 495. In *Steven R.,* this Court held that a mother was denied due process when the district court failed to arrange for her participation in her termination hearing and failed to inquire into whether she had waived her due process rights. 1999–NMCA–141, ¶¶ 10–13, 128 N.M. 304, 992 P.2d 317.

{27} We note, initially, that the cases cited by Father address waiver and a default adjudication order entered in the context of termination hearings. In this case, Father now seeks to challenge an adjudication of neglect from which he did not appeal. In any event, as this Court pointed out in *State ex rel. Children, Youth & Families Dep't v. Vanessa C.,* 2000–NMCA–025, ¶ 14, 128 N.M. 701, 997 P.2d 833, not all court rulings finally terminate a person's parental rights, and as Father acknowledges, the invalidity or illegality of the adjudication does not necessarily invalidate the judgment terminating parental rights. *In re Termination of Parental Rights of Eventyr J.,* 120 N.M. 463, 473, 902 P.2d 1066, 1076 (Ct.App.1995).

{28} In this case, the adjudication did not finally terminate Father's rights; he had the opportunity to take advantage of the treatment plan put in place by the district court, but failed to do so. Although Father argues that he was unable to follow a treatment plan because he was incarcerated, the record shows that Father failed to take advantage of an extensive plan put in place for him on his release. Father argues, however, that in this case, "the trial court relied on the adjudication as the primary basis for its finding of neglect."

{29} As summarized in the Background section of this opinion, the State presented clear and convincing evidence at the termination hearing supporting the termination of Father's parental rights. *See* NMSA 1978, § 32A–4–29(L) (2001). The district court entered findings and conclusions based on this evidence. This Court views the evidence "in the light most favorable to support the trial court's findings and conclusions of law." *State ex rel. Children, Youth & Families Dep't v. David F., Sr.,* 121 N.M. 341, 350, 911 P.2d 235, 244 (Ct.App.1995). Accordingly, we hold that the judgment terminating Father's parental rights was based on clear and convincing evidence presented at the termination hearing and not based on the default adjudication that occurred one year and ten months earlier.

## CONCLUSION

{30} For the foregoing reasons, we affirm.

{31} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN and CYNTHIA A. FRY, Judges.